THE CITY OF NEW YORK, Appellant, *v.* BROOKLYN UNION ELEVATED RAILROAD COMPANY and NEW YORK CONSOLIDATED RAILROAD COMPANY, Respondents.

First Department, April 5, 1918.

Municipal corporations — city of New York — contract respecting payment of tolls by railroad operating over Williamsburg bridge — — abrogation of contract by subsequent execution of inconsistent contract.

The contract made in 1907 between the city of New York as owner of the Williamsburg bridge and the Brooklyn Elevated Railroad Company whereby the latter was required to pay certain tolls to the city for operating its railroad over said bridge was superseded by a subsequent

agreement made by the city of New York, acting through the Public Service Commission and the Municipal Railway Corporation, as successor to the rights and obligations of the elevated company, providing for the building and equipment of additional lines to be owned by the city and leased to companies owning existing rapid transit lines, all of which were to be operated as one system. The terms of the latter contract are so inconsistent with the terms of the previous agreement that the latter was abrogated although there was no express abrogation.

APPEAL by the plaintiff, The City of New York, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 5th day of April, 1916, upon the verdict of a jury rendered by direction of the court, both sides having moved for the direction of a verdict at the close of the case, and also from the order entered in said clerk's office on the 31st day of March, 1916, directing said verdict.

*William E. C. Mayer* of counsel [*Terence Farley, Josiah A. Stover* and *Harold N. Whitehouse* with him on the brief; *William P. Burr, Corporation Counsel*], for the appellant.

*Charles L. Woody* of counsel [*A. M. Williams* with him on the brief; *George D. Yeomans*, attorney], for the respondents.

SHEARN, J.:

The action was brought to recover tolls for the operation of trains across the Williamsburgh bridge during the period from August 4, 1913, to May, 1914, under an agreement dated April 26, 1907, between the city of New York, acting by the commissioner of bridges, and the Brooklyn Union Elevated Railroad Company. The defendants claimed that this agreement had been superseded by a subsequent agreement made by the city of New York, acting through the Public Service Commission, and the New York Municipal Railway Corporation (successor to the rights and obligations of the Elevated Company), which agreement is referred to as contract No. 4, dated March 19, 1913, being one of the subway contracts, providing for the building and equipment of additional lines to be owned by the city and leased to companies owning existing rapid transit lines, all of which were to be operated as one. The Special Term determined that contract No. 4

was so inconsistent with the provisions of the agreement of 1907 that it must be deemed to have been the intention of the parties to abrogate the latter agreement, although there was no express abrogation.

Among the provisions of the contract of 1907 it is recited that the city is the owner of the bridge and approaches thereto, has constructed upon the bridge two elevated railway tracks necessary for the operation of elevated railway cars, and is constructing a station at the Manhattan terminal of the bridge; that the commissioner has determined it to be in the public interest that the city shall contract with a corporation to operate cars on said elevated railway tracks upon the bridge; that it is agreed by the city to complete as soon as practicable the station and the installation of equipment, and that as soon as this is done and connection made with the company's tracks, the cars operated on the bridge tracks shall be operated thereafter by the company during one year from the date that the commissioner shall declare the bridge opened to railway traffic; that after the termination of said period, operation of cars upon the elevated railway tracks shall be continued by the company under the terms of the contract until one year after the commissioner shall have notified the company in writing to cease such operation, but after the expiration of said period the company shall have the right to cease such operation on one year's notice. By paragraph IV the company agrees to keep and maintain the elevated tracks on the bridge and the electrical equipment in good order and repair during the terms of the contract. By paragraph VI the city agrees to make all repairs to the bridge and station structures, except such repairs as may be rendered necessary by damage caused by the negligence of the company. Paragraph VII provides that all cars used on the bridge by the company and all equipment and appliances relating thereto located on the bridge shall be subject at all times to inspection by the commissioner, who shall have power to forbid rights on the bridge to cars that may for any reason be unsatisfactory, and to direct the removal of any old or inadequate appliance and the substitution therefor of trains of approved character; and that the said supervision, management and control of said cars shall in every particular and at all times

be wholly exercised by the commissioner, who shall regulate and limit the total number of cars operated. Paragraph VIII gives the commissioner full power to make and adopt reasonable rules and regulations relating to the operation of cars over the bridge. Paragraph X imposes a " license fee " of ten cents per round trip for each car operated across the bridge.

The company was operating under this agreement at the time contract No. 4 was executed. Contract No. 4 describes the railroads of the company, for operation in conjunction with city lines, as " existing railroads." This definition does not include the railroad across the Williamsburgh bridge, but does include that across the Brooklyn bridge. The contract defines the rapid transit lines already constructed or to be constructed and which the city agreed to lease to the company and to assure to it the right to operate as the " railroad." This definition includes the railroad across the Williamsburgh bridge, paragraph 8 of article II providing: " The word ' Railroad ' shall also include a railroad right of way, as hereinafter described, over each of the existing bridges over the East River, other than the New York and Brooklyn Bridge on which trackage rights are claimed by the lessee."

In chapter II, article IV, of the contract, where rapid transit lines of the city " to be constructed for initial operation and to be equipped, maintained and operated under this contract " are described at length, we find the " Railroad " across the Williamsburgh bridge included in the description of subdivision IV of the Broadway-Fourth avenue line: " thence as a two-track railroad over the Manhattan Approach to the Williamsburgh Bridge and over. the main span of the Williamsburgh Bridge to the Brooklyn Approach thereto." It is entirely clear, to my mind, that the right of way over the Williamsburgh bridge is a part of the system of rapid transit lines of the city to be equipped, maintained and operated under contract No. 4. It appears that the city had constructed and owned a subway line called the " loop," running from the Municipal building to the entrance to the Williamsburgh bridge, designed to be connected with the elevated tracks over the bridge. This was completed and ready for joint operation long before the lease was to take effect, which latter date was January 1,

1917. Contract No. 4, however, provided for temporary operation prior to the " initial operation " referred to in the lease, and, as to this, the contract read in part: " When and as the Commission shall declare parts of the Railroad to be ready for equipment, the lessee shall forthwith equip the same, and when declared by the Commission to be ready for operation the lessee shall forthwith commence the operation of such part or parts in connection with the existing railroads . * * *. The earnings of such part or parts shall be combined with those of the existing railroads and the revenue shall be distributed as provided in articles XLIX, L and LI," etc. It appears that by resolution dated August 1, 1913, the Commission declared that certain parts of the railroad " in Centre and Delancey Streets in the Borough of Manhattan " were and would be ready for operation at midnight on August 3, 1913, and it is alleged in the answer, paragraph VIII: " That at or about midnight on August 3rd, 1913, in pursuance of the said resolution of August 1, 1913, the defendant, New York Consolidated Railroad Company, commenced operation over that part of the railroad described in Subdivision IV of the Broadway-Fourth Avenue Line in Centre and Delancey Streets, declared to be ready for operation by said resolution, and over, along and upon the Williamsburgh Bridge and the Approaches thereto in connection therewith."

The corporation counsel attaches great significance to the fact that the resolution referred to merely declared the railroad *in Centre and Delancey streets* ready for operation and, although this was required to be connected up with the " Existing Railroads " in Brooklyn, which could not be done except by operating over the bridge, the city contends that it cannot be said that this resolution declared or brought the *bridge operation* within the terms of the contract, but that the railroad should still be required to pay approximately $50,000 a year license fees for crossing the bridge and, in addition, be required to bear the expense of operating over the bridge and divide with the city its profits growing out of the operation of the loop in connection with its existing lines in Brooklyn. This contention seems to be very unreasonable. It is frankly admitted in the city's brief that: " The act of the Public Service Commission, in passing the resolution

opening up for traffic two particularly described tracks of the Centre Street Loop, without any reference whatever to the use of the City's tracks on the Williamsburgh Bridge to connect the operation of the new Loop with the 'Existing Railroad,' the Broadway Line ending at the easterly entrance of the Williamsburgh Bridge, was conduct, on the Commission's part, which clearly indicated and contemplated an operation over the bridge tracks in order to make the use of the Centre Street Loop possible."

It must be held, it seems to me, that the resolution requiring this operation of the loop *in connection with* the " Existing Railroads " constituted, under the Rapid Transit Act and contract No. 4 (duly approved by the board of estimate and apportionment), full authority to operate across the bridge. Such operation, of course, involved expense on the part of the railroad, and a part of the fare charged between any Brooklyn point and the Municipal building necessarily included a return for the service rendered by the railroad in transporting the passengers across this bridge.   For the right so to do, naturally resulting in a large increase in fares by reason of the additional convenience to passengers afforded by the loop to the Municipal building, which stimulated traffic, the railroad agreed to share with the city the profits of such operation.   An agreement to pay twice for the same privilege should be stated in plain terms, for, as a matter of mere inference, it is unreasonable.

The only substantial argument that I can see in favor of the city's contention is that the toll charge exacted by the city through its bridge commissioner under the agreement of 1907 was intended to include the cost to the city of keeping the bridge in good repair considering the wear and tear of railroad operation.   Whether the profits from this joint operation will net the city as much as it obtained from the bridge tolls does not appear, but it is reasonable to assume that, in reaching an agreement with the railroad, the city had in mind the necessity of maintaining the bridge, and that it expected to get enough out of the profits to take care of this item.   The argument of the corporation counsel, to my mind, is completely outweighed by the inconsistencies between the two agreements.   From the quotations from the contract

of 1907 above made it appears that, if such contract is still in force and effect, notwithstanding the fact that the city, acting through the Public Service Commission, compels and requires the operation of cars over the bridge, nevertheless the bridge commissioner may prevent such operation by withholding his license and thus cut out an essential link in the operation of a common system. Furthermore, the law gives the Public Service Commission full authority with respect to the kind of service maintained, the number and kind of cars, etc., yet this contract of 1907 places this matter wholly within the authority of the commissioner. Similarly, the Public Service Commission has under the law full power to make reasonable rules and regulations relative to the operation of cars, yet, under the contract of 1907, this same power rests in the commissioner of bridges. These inconsistencies are so radical and so obvious that it must have been the intention of the city to abrogate the agreement of 1907 when it entered into contract No. 4, acting through the Public Service Commission and with the approval of the board of estimate and apportionment.

The judgment and order should be affirmed, with costs.

Clarke, P. J., Smith, Page and Davis, JJ., concurred.

Judgment and order affirmed, with costs.